**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **DEBRA MANNING,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **No. 04 C 3764** |
| ) | |
| **JO ANNE BARNHART,** ) | **Judge Rebecca R. Pallmeyer** |
| **COMMISSIONER FOR SOCIAL** ) | |
| **SECURITY,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Debra Manning claims that she is disabled by the physical and emotional results of breast cancer surgery. Plaintiff filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for a period of disability, Supplemental Security Income ("SSI"), and Disability Insurance Benefits ("DIB") under Titles II and XVI of the Social Security Act. *See* 42 U.S.C. §§ 423(d) and 1381(a). The parties have filed cross motions for summary judgment. For the reasons set forth below, Plaintiff's motion for summary judgment is granted, the Commissioner's motion for summary judgment is denied, and this matter is remanded to the ALJ for further evaluation.

## PROCEDURAL HISTORY

On May 30, 2001, Plaintiff applied for SSI and DIB benefits, alleging the onset of a disability on January 29, 2001. (R. at 105, 112, 145.)[1] Plaintiff's applications were initially denied on July 2, 2001, (R. at 86, 249), and her requests for reconsideration were denied on January 24, 2002. (R. at 91.) After the Commissioner denied Plaintiff's applications, she requested a hearing before an Administrative Law Judge ("ALJ"). (R. at 19.) The ALJ conducted this hearing, at which Plaintiff and a vocational expert testified, on October 2, 2002. (*Id.*) The ALJ issued an unfavorable decision

---

[1]     Citations to the record refer to the certified administrative record prepared by the Commissioner and filed with this court pursuant to 42 U.S.C. § 405(g).

on November 21, 2002.  (R. at 16.)  The ALJ found that Plaintiff had a "severe" impairment from "physical and emotional residuals from breast cancer and related treatment," but this impairment did not reach the level of severity that would prevent Plaintiff from performing any gainful activity based on the impairments listed in 20 C.F.R. 404, Subpart P, Appendix 1.  (R. at 21, 24.)  The ALJ further determined that Plaintiff could not perform her past work as a postal clerk, but that Plaintiff has the functional capacity to perform light work in a low-stress work environment.  (R. at 27-28.)  The ALJ also found Plaintiff to lack credibility and therefore considered her testimony and the subjective information she provided to health care professionals to be unreliable.  (R. at 22.)  After finding Plaintiff capable of performing a significant number of jobs in the national economy, the ALJ concluded that Plaintiff was not disabled.  (R. at 30.)

On January 24, 2003, Plaintiff appealed the ALJ's decision to the Appeals Council of the Office of Hearings and Appeals.  (R. at 15.)  On March 28, 2003, the Appeals Council denied Plaintiff's request for review of the ALJ's decision.  (R. at 12.)  Plaintiff subsequently appealed to the Appeals Council with additional information, and the Appeals Council again denied Plaintiff's request for review of the ALJ's decision on April 9, 2004.  (R. at 5.)[2]  Plaintiff timely filed the present action on June 2, 2004 seeking judicial review of the ALJ's decision.

---

[2]　　Additional information submitted to the Appeals Council included a psychological evaluation with an assessment of Plaintiff's mental residual functional capacity and outpatient progress notes.  (R. at 9.)  If the Appeals Council declines to review an ALJ's decision, the role of the District Court is only to evaluate the ALJ's decision based on the evidence that was before the ALJ.  *See Eads v. Sec'y of Dept. of Health and Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993).  The court is therefore precluded from considering new evidence submitted to the Appeals Council in support of the application for review, and will not now consider the findings in this additional psychological evaluation, which was conducted on February 11-12, 2003, (R. at 259-71), or the outpatient progress notes.  (R. at 275-83.)

## FACTUAL BACKGROUND

Plaintiff was born on January 19, 1959, (R. at 112), and is a high school graduate. (R. at 39.) She was forty-three at the time of the hearing before the ALJ. (*Id.*) From 1984 until September of 2000, Plaintiff was employed as a clerk by the U.S. Postal Service. (R. at 117-18.) Her primary responsibilities in that position included placing bags of mail on and off a conveyor belt, putting the bags into a container, and pushing or pulling the container to the elevator. (R. at 40.)

### A. Medical History

#### 1. Breast Cancer

Plaintiff was diagnosed with breast cancer on January 29, 2001 and had two tumors excised from her left breast by surgeon Gregorio Aglipay, M.D. at Trinity Hospital. (R. at 161-64.) Plaintiff was referred to an oncologist, Richard F. Warren, M.D., for evaluation. At her initial visit with Dr. Warren on February 16, 2001, Plaintiff reported that she felt well, and Dr. Warren recorded that Plaintiff had "no complaints at present." (R. at 177.) Plaintiff also informed Dr. Warren that her alcohol intake at the time was three shots, three times a week. (*Id.*) Dr. Warren informed Plaintiff that in light of "positive imaging," she might need further excision or a mastectomy. (*Id.*) On March 5, 2001, Dr. Aglipay performed a modified radical mastectomy and completely removed Plaintiff's left breast and the axillary fat pads. (R. at 165.)[3]

Plaintiff visited with Dr. Warren again on April 11, 2001. (R. at 176.) In this visit, Plaintiff informed Dr. Warren that she felt well, but reported "some discomfort" in her upper left arm. (*Id.*) She had not yet begun taking Tamoxifen, which had been prescribed for her, but agreed to do so. (*Id.*)[4] Dr. Warren scheduled another visit with Plaintiff for three months later. (*Id.*) On June 14,

---

[3]    A "modified radical mastectomy" is a total mastectomy (or, excision of the breast) with axillary node dissection "but with preservation of the pectoral muscles." *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 11, 992 (28th ed. 1994) (hereinafter, "DORLAND'S").

[4]    Tamoxifen, used to treat breast cancer after surgery and used to reduce the chances
(continued...)

2001, Dr. Warren completed a report for the Illinois Bureau of Disability Determination Services. (R. at 178.) In this report, Dr. Warren stated that Plaintiff had her left breast removed, had no metastatic sites, and was taking Tamoxifen for risk reduction. (*Id.*) He reported further that he was not aware that Plaintiff had any other impairments or conditions, and that Plaintiff's ability to do work-related activities such as moving about, lifting, and handling objects, was "normal, as far as [he was] aware." (*Id.*)

### 2. Mental Health

On November 15, 2001, Plaintiff met with a psychiatrist, Kenneth Levitan, M.D., for a consultative psychiatric exam that lasted forty minutes. (R. at 180.) Before the interview, Dr. Levitan had reviewed some portions of Plaintiff's "own disability report." (*Id.*)[5] In this interview, Dr. Levitan recorded some of Plaintiff's family history, including that she was married for twenty-two years and separated from her husband six months before the interview; in other words, about two months after her mastectomy. (R. at 182.) Dr. Levitan noted Plaintiff's opinion that although she had marital problems before her mastectomy, they became worse after her surgery. (*Id.*) Dr. Levitan described Plaintiff as being "well groomed," "reserved," and "anxious in her demeanor." (R. at 180.) At the interview, Plaintiff denied any past psychiatric hospitalizations or counseling, but reported that she was having hallucinations when she was in her home alone. (*Id.*) Plaintiff acknowledged that she had been a heavy drinker in the past, for six or seven years, but denied that she was an alcoholic. (R. at 180-81.) Plaintiff told Dr. Levitan that she last drank heavily about eight months prior to her mastectomy, "consuming about ½ pint of brandy" every other day. (R. at

---

[4](...continued)
of breast cancer in high-risk patients, can block the growth of breast cancer by interfering with the effects of estrogen in the breast tissue. *See* http://www.webmd.com/drugs/drug-4497-Tamoxifen+Oral.aspx?drugid=4497&drugname=Tamoxifen+Oral.

[5]        The court presumes that Dr. Levitan is referring to the Disability Report that Plaintiff completed in connection with her application for benefits to the Social Security Administration. (R. at 116-25.)

180.)  As of the time of her interview with Dr. Levitan, Plaintiff claimed that she was consuming two 12-ounce bottles of beer every other day and sometimes more on weekends.  (R. at 180-81.)

Plaintiff told Dr. Levitan that she had residual pain from her mastectomy, which she described as "constantly shooting sharp pains." (R. at 181.)  She also informed Dr. Levitan that she had trouble sleeping as a result of the pain and that her prescribed medicine, which at the time included Tylenol PM, Aleve, Vicodin, Claritin-D, Tamoxifen, and Lotrisone cream, made her feel "drowsy, weak, and dizzy."  (*Id.*)  Plaintiff reported she had been depressed for eight years following the deaths of her sister, father, and brother, all from cancer, and she attributed her depression for the past year to her own breast cancer diagnosis.  (*Id.*)  Dr. Levitan noted Plaintiff's "increased sadness with tears" as she was talking about her depression, but observed that Plaintiff "was somewhat vague about [how] her depression would currently interfere with her working."  (R. at 182.)

Plaintiff described her daily living to Dr. Levitan.  With "increased sadness," Plaintiff informed Dr. Levitan that she has very few friends and avoids dating because of her breast surgery.  (*Id.*) Plaintiff said she does light cleaning but needs help washing her hair because she cannot lift her arm high enough.  (*Id.*)  She acknowledged that she manages her own finances and spends some money on alcohol.  (*Id.*)

Dr. Levitan reported that Plaintiff related in a "varied, anxious, and often sad way."  (R. at 183.)  Plaintiff's speech was normal, and although she described herself as "sad," she denied any suicidal thoughts and Dr. Levitan found no looseness of associations in her thought process.  (*Id.*) Plaintiff was oriented, according to Dr. Levitan, but she informed him that she had difficulty concentrating, Dr. Levitan's report that "difficulty was noted," suggests he himself observed Plaintiff's concentration difficulties.  (*Id.*)  Plaintiff's recent memory and her remote memory "seemed good" although "her ability to think abstractly seemed somewhat off."  (*Id.*)

Dr. Levitan diagnosed Plaintiff with "mixed-anxiety depression with possible somatization

and emotional overlay of her physical problems."[6]  Dr. Levitan concluded that Plaintiff's mixed anxiety-depression was a reaction to her breast cancer, mastectomy, and "sequellae" [sic].  (R. at 184.)[7]  He further found that she was a past chronic alcohol abuser "and possible chronic alcoholic." (*Id.*)  Dr. Levitan also concluded that Plaintiff "could perform simple and routine tasks" but "would have difficulty handling regular work pressure and stress," which could cause Plaintiff to focus more on her physical problems and symptoms.  (*Id.*)  Dr. Levitan determined that Plaintiff could communicate with co-workers or a supervisor; could follow, understand, and retain most instructions; and appeared to be able to manage her funds, unless engaged in heavy drinking.  (R. at 183.)

Plaintiff was also evaluated by state agency psychologist Donald MacClean, Ph.D., on December 26, 2001.  (R. at 185.)[8]  Dr. MacClean determined that Plaintiff had mixed anxiety/depression, (R. at 188), and a "substance addiction disorder."  (R. at 193.)  Dr. MacClean did not, however, check any of the boxes in the portion of the evaluation relating to "somatoform disorders" or "physical symptoms for which there are no demonstrable organic findings."  (R. at 191.)  In assessing Plaintiff's functional limitations, Dr. MacClean found that Plaintiff's mental disorders mildly limited her "activities of daily living," her ability to maintain "social functioning," and her ability to maintain "concentration, persistence, or pace."  (R. at 195.)  Dr. MacClean did not find

---

[6]     "Somatization" is "the expression of mental phenomena as physical (somatic) symptoms" and is characterized by physical complaints that "cannot be explained fully by a physical disorder."  THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 1736-40 (18th ed. 2006) (hereinafter, "MERCK").

[7]     "Sequelae" are the "aftereffect[s] of disease or injury."  MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1068 (10th ed. 1997).

[8]     Dr. MacClean's evaluation of Plaintiff's ability to concentrate and social functioning imply that he examined Plaintiff in person, but this fact is not clear from the administrative record.

that Plaintiff's disorders resulted in any episodes of decompensation of extended duration. (*Id.*)[9]

Dr. MacClean characterized Plaintiff's limitations as "primarily physical" and found Plaintiff to have few limitations in her "Mental Residual Functional Capacity" ("RFC"). (R. at 197, 199.)[10] According to Dr. MacClean, Plaintiff is moderately limited in her ability to understand, remember, and carry out detailed instructions, and her ability to respond appropriately to changes in the work setting. (R. at 199-200.) Dr. MacClean found that Plaintiff is not significantly limited in any other categories, including her ability to understand and carry out short and simple instructions, her ability "to maintain attention and concentration for extended periods," her ability to complete a normal workday or week at a consistent pace without interruptions from psychologically based symptoms or the need for unreasonable rest periods, and her ability to interact with the general public. (*Id.*) Dr. MacClean's overall conclusions about Plaintiff's functional capacity were that she could "understand, remember, and carry out simple tasks," make basic decisions at work, get along with others, and "cope with changes in simple work situations." (R. at 201.)

In June 2002, Plaintiff was treated at the Chicago Department of Public Health ("CDPH") in the Division of Mental Health. (R. at 206.) Plaintiff's primary clinician at the CDPH was Karen Simpson, and her psychiatrist was Sylvia Santos, M.D. (R. at 208.) Between June 20, 2002 and September 25, 2002, Plaintiff received counseling at CDPH numerous times with additional contact by phone. (R. at 216-44.) In these counseling sessions, Plaintiff discussed her depression and fear of death. (*Id.*) On June 20, 2002, Simpson diagnosed Plaintiff principally with a major depressive affective disorder but also noted that Plaintiff had an adjustment disorder with mixed emotional features, a generalized anxiety disorder, and a personality disorder. (R. at 206-07.) Simpson

---

[9]     In psychiatry, "decompensation" is the "failure of defense mechanisms resulting in progressive personality disintegration." DORLAND'S at 432.

[10]     The RFC represents what an individual can do, despite her limitations. *See* 20 C.F.R. § 404.1545(a).

further noted that Plaintiff had functional impairments in the areas of economics, health care, and social isolation. (R. at 206.) Simpson determined Plaintiff to have a global assessment of functioning (GAF) score[11] of fifty-five and noted that this was Plaintiff's highest GAF score in the past year. (R. at 206.)[12]

In July 2002, Plaintiff met with Dr. Santos. (R. at 212.) Plaintiff told Dr. Santos that she had become depressed after her sister died of cancer and that her symptoms became severe after she was diagnosed with breast cancer. (Id.) Dr. Santos diagnosed Plaintiff with "major depressive disorder, single episode, moderate," and assigned her a current GAF score of fifty. (R. at 213.) Dr. Santos observed that Plaintiff exhibited a depressed mood, tearfulness, and stuttering, and that she was preoccupied with thoughts of her physical health. (R. at 212.) Dr. Santos recommended supportive counseling and increased Plaintiff's prescription for Zoloft from 50 milligrams to 100 milligrams per day. (R. at 213.)[13] In an August 27, 2002 mental health progress report, Dr. Santos observed that Plaintiff's insight was "good" and that her speech, affect, memory, and thought contents were all "within normal limits." (R. at 214.) Plaintiff's mood was still dysphoric, according to Dr. Santos, but her judgment was intact. (Id.) The record also includes progress notes dated September 2002 that observe that Plaintiff reported improvement in her anxiety and mood, but that she still had difficulty sleeping; the identity of the individual who made these notes is not clear from the record. (R. at 215.)

---

[11] A GAF score is a rating on a scale of zero to 100 that represents an individual's overall psychological functioning; lower scores indicate a greater level of impairment and higher scores indicate a higher level of functioning. Am. Psychiatric Ass'n., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th ed. 2000). A score between forty-one and up to and including fifty indicates serious symptoms or impairment. Id. at 34.

[12] The record does not reflect how Simpson was aware of Plaintiff's prior GAF scores or what Plaintiff's GAF scores were prior to June of 2002.

[13] "Zoloft" is a drug used to treat depression. See http://www.webmd.com/drugs/mono-8095-SERTRALINE+-+ORAL.aspx?drugid=35&drugname=Zoloft+Oral.

On October 1, 2002, Plaintiff met with Dr. Santos for a further assessment of her RFC. (R. at 203.) This time, Dr. Santos diagnosed Plaintiff with "major depressive disorder, single episode, moderate" and determined that Plaintiff's limitations began in August 2001 and would likely last for twelve months or longer. (R. at 205.) Dr. Santos concluded that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed or two-step instructions, to interact appropriately with supervisors and coworkers, to sustain concentration and attention, and to deal appropriately with the public. (R. at 203-04.)[14] In the RFC, Dr. Santos also stated that because Plaintiff suffers from major depression and would be unable to concentrate and sustain attention, she would likely experience episodes of decompensation under the stress of competitive full-time or part-time work. (R. at 204.) Dr. Santos further noted Plaintiff's history of alcohol abuse and Plaintiff's assertion that she had been sober since July 4, 2002. (*Id.*)

## B. Plaintiff's Testimony

Plaintiff testified at the October 2, 2002 hearing before the ALJ and was represented by an attorney, Carolyn M. Burns. (R. at 37.) Plaintiff testified that she sustained injuries to her left arm and her lower back while working in her job as a clerk for the U.S. Postal Service in May 2000. (R. at 57.) According to Plaintiff, she was formally dismissed from her job in September 2000 because she did not return to work from medical leave following that injury. (R. at 41.) Plaintiff explained her failure to return to work by noting that at the time she was due to return, she "found out that she had problems with . . . felt something." (*Id.*)[15]

---

[14]    The evaluation form defines "moderate" as an "impairment that imposes more than marginal but less than serious affect on the ability to function in an area." (R. at 203.)

[15]    Plaintiff's testimony that she did not return to work in September because she "felt something" is arguably contradicted by other evidence in the record. On her initial questionnaire regarding daily living, Plaintiff stated that she "noticed a lump in [her] left breast . . . in the last of October or beginning of November 2000." (R. at 144.) But, in Plaintiff's interview with Dr. Levitan, Plaintiff claimed that she did not submit the required medical papers on time when she was off work, which resulted in her termination. (R. at 181.)

Plaintiff was diagnosed with breast cancer on January 29, 2001 and underwent a mastectomy on March 5, 2001.  (R. at 40-41.)  She did not undergo any chemotherapy or radiation, but was prescribed a five-year course of Tamoxifen, a drug that has caused Plaintiff to "break out," sweat, and have hot flashes.  (R. at 42.)  Apart from the ongoing drug therapy, Plaintiff has received no other treatment for cancer after March 16, 2001.  (R. at 52.)  She did, however, continue to see Dr. Warren and Dr. Aglipay for follow-up cancer treatment every two months up until about two months before the October 2, 2002 hearing.  (R. at 54.)  According to Plaintiff, she stopped seeing these doctors because she lacked a medical card and, as of September 12, 2002, she began going "to Cook County" to see the doctor and get her medications.  (R. at 42.)

Plaintiff also testified that she began meeting with Dr. Santos around August 2001 to discuss her feelings.  (R. at 42-43.)  At the time of the hearing, Plaintiff had met with Dr. Santos three times for approximately thirty minutes each time.  (R. at 43.)  Dr. Santos initially prescribed Plaintiff 50 milligrams of Zoloft and eventually increased the dosage to 150 milligrams a day.  (R. at 43-44, 71.)  Plaintiff also stated that she attended "Y me," a cancer survivor therapy group, for the first time one month before the hearing.  (R. at 44.)  Plaintiff testified that she was seeing a therapist who works with Dr. Santos once a month initially and twice a month at the time of the hearing, and she also testified that she was in contact with the therapist "all the time," often by telephone.  (R. at 70.)

Plaintiff testified that she previously took Vicodin, but after she began getting her medicine from Cook County, she began taking Neurontin instead; Plaintiff did not specify for how long she took Vicodin but had been on the Neurontin for two months at the time of the hearing.  (R. at 45.)[16]

---

[16]     Neurontin is used together with other medications to help control seizures and is also used to relieve some types of nerve pain.  *See* http://www.webmd.com/drugs/mono-8217-GABAPENTIN+-+ORAL.aspx?drugid=9845&drugname=Neurontin+Oral.   According to a list of medications Plaintiff submitted as a part of her application for benefits, Plaintiff's Neurontin was prescribed by Dr. Warren on June 9, 2002.  (R. at 156.)  Another list of medicines included as a part
(continued...)

According to Plaintiff, the Neurontin causes her to have slurred speech, blurred vision, and forgetfulness about an hour after taking the medicine. (R. at 46.) Plaintiff also takes acetaminophen with codeine to alleviate pain. (*Id.*)[17] Plaintiff testified that her pain is in her shoulder and extends to her elbow all throughout the day and night. (R. at 47.) Plaintiff also described "throbbing" pain across the top of her shoulders. (*Id.*) Plaintiff rated her pain as a seven on a scale of one to ten (with ten being the worst) and testified that the medicine only relieves her pain temporarily. (*Id.*)

Plaintiff testified that she is unable to perform her previous job as a mail handler because it required lifting, pulling, and pushing. (R. at 48.) She described her limited use of her left arm and stated that she sometimes suddenly drops things she is holding with that arm. (*Id.*) Plaintiff stated that she can hold about five to eight pounds, stand for about thirty minutes, and walk about three or four blocks. (*Id.*) She testified, further, that she tires easily, (R. at 73), and that, although she is right-hand dominant, the limitations in her left-arm function render her unable to use her hands together frequently. (R. at 50.)

With respect to her mental health, Plaintiff testified that she experiences hallucinations approximately twice a week, and that she also has difficulty sleeping; she sleeps at most for an hour and a half at a time. (R. at 58-59.) Plaintiff described her worry that the cancer was "eating [her] up" and expressed concern about her family's history of cancer. (R. 60-61.)

Finally, Plaintiff testified about her daily activities. Plaintiff knows how to drive but does not drive much anymore because she cannot concentrate. (R. at 63.) She takes the bus about every

---

[16](...continued)
of a Comprehensive Mental Health Assessment at CDPH confirms that Plaintiff was prescribed Neurontin in June 2002, but lists Dr. Aglipay as the prescribing doctor. (R. at 241.)

[17]    Acetaminophen and codeine are both used to relieve pain. DORLAND'S at 348. According to the list of medications Plaintiff submitted as a part of her application for benefits, Plaintiff was prescribed acetaminophen with codeine to alleviate pain on September 12, 2002 by Dr. Parker, who is not mentioned elsewhere in the record. (R. at 156.)

other week, but most of the time someone gives her a ride to wherever she needs to go. (R. at 50.) On the day of the hearing before the ALJ, Plaintiff took public transportation to the hearing by herself. (R. at 73.) Plaintiff has an eighteen-year-old son, but lives by herself. (R. at 61.)[18] Plaintiff testified that she sees her sister, with whom she has a close relationship, every day, but otherwise does not like to be around people and has no friends. (R. at 51.) She did attend a family dinner on Memorial Day and a family picnic on July 4, 2002, but arrived late or left early because of her depression. (R. at 57.) Plaintiff admitted that she "used to drink" and said that she had one drink on Memorial Day and another on the Fourth of July, but claimed that she was not drinking prior to these occasions because she was not supposed to drink alcohol with her medications. (R. at 56.)

Due to Plaintiff's limited use of her left arm, her sister, who is a beautician, washes and dries her hair about once a week. (R. at 65.) In the meantime, Plaintiff wears her hair in a ponytail and takes showers. (R. at 65-66.) According to Plaintiff, she cooks breakfast and her sister, who lives next door, cooks dinner for her. (R. at 66.) Plaintiff used to participate in such activities as skating, bowling, horseback riding, and dancing, but no longer does so. (R. at 63.) Because she cannot "do things," Plaintiff asserted, her son no longer wants to be around her. (R. at 68.) Plaintiff testified that she does still play board games with her son and sister, though not often. (*Id.*) The ALJ questioned Plaintiff about her appearance at the hearing, and Plaintiff acknowledged that she did care about how she looked, was wearing jewelry, and had painted her nails herself. (R. at 74.)

### C.    Vocational Expert's Testimony

Dr. Richard J. Hamersma testified at the hearing as a vocational expert ("VE"). He testified that Plaintiff's work as a postal clerk from 1984 to 2000 required medium exertion and constituted "unskilled" work. (R. at 77.) The ALJ asked the VE to consider whether such work was within the

---

[18]    It appears that Plaintiff's son has lived with her at certain points in time. (R. at 182, 212.) A mental health assessment dated July 20, 2002 reflects that Plaintiff's son was incarcerated at that time. (R. at 236.) It is not clear where Plaintiff's son was living at the time of the hearing.

capacity of a younger individual with a high school education who is able to perform light work and requires a low-stress environment with minimal interaction with coworkers and the public. (*Id.*) The VE testified that an individual with this vocational profile could not perform Plaintiff's past work. (*Id.*) According to the VE, such an individual could, however, perform the light, unskilled work of an assembler (8,000 jobs in Chicago metropolitan, six county area), hand packager (7,000 in the area), and inspector (6,500 in the area). (*Id.*) The VE testified that these jobs were representative, but not exclusive, examples of jobs this hypothetical individual could perform. (*Id.*)

The VE further testified that this hypothetical individual could not meet the demands of these light, unskilled jobs if she could not tolerate consistent work pressure on a sustained basis such that she would be "off task" frequently. (R. at 78.) When asked by the ALJ whether, "anything that takes [an individual] off task such as concentration lapses due to medication is going to further limit [her] ability to carry on competitive employment," the VE responded that if a person is "off task more than 5 percent of the time, and certainly more than 10 percent of the time," there would be a "significant reduction" in the numbers of jobs she could perform. (R. at 78-79.) Additionally, the VE testified that the above-mentioned jobs require more than occasional holding, handling, and fingering objects and would not be available to an individual who can only handle, hold, and finger items bilaterally on an occasional basis. (R. at 78.)

On cross-examination, the VE confirmed that a critical ability for unskilled work is "the ability to maintain attention for extended periods of time," meaning "at least two-hour segments." (R. at 79.) He also confirmed that "the ability to complete a normal work day and work week without interruptions" from psychological symptoms or the need for an "unreasonable number and length of rest periods" are also critical to unskilled work. (R. at 80.)

### D.  Affidavit of Phyllis Johnson Jarvis

Plaintiff's sister, Phyllis Johnson Jarvis, executed an affidavit on October 12, 2002, which was subsequently submitted to the ALJ.  (R. at 158.)  In that affidavit, Jarvis stated that she lives next door to Plaintiff and that they see each other at least two to three times a week.  (R. at 157.)  Jarvis further stated that Plaintiff's father, brother, and older sister, Annette, died from cancer and explained that Plaintiff and her deceased older sister were very close and that Plaintiff took their sister's death hard.  (*Id.*)  According to Jarvis, Plaintiff did not begin acting strangely until after her own breast cancer diagnosis.  (*Id.*)  Before that, Jarvis recalled, Plaintiff was dependable, calm, and kept good records.  (*Id.*)  Since her diagnosis, Jarvis testified, Plaintiff had unpredictable mood swings—vacillating from angry to tearful and depressed—and had difficulty sleeping.  (*Id.*)  Post-diagnosis, Jarvis has found that Plaintiff is always saying that she is in pain and tired, is "very disorganized and unreliable," and is no longer meticulous about her appearance.  (*Id.*)  Plaintiff's behavior has changed in other ways since the cancer as well, according to Jarvis, including that she has difficulty dealing with her family, does not do the things she used to do, seldom goes out, has to be coaxed to attend family functions, and is anxious about others knowing that she had her breast removed.  (*Id.*)

### E.  Decision of the Administrative Law Judge

#### 1.  The Five-Step Test

The Social Security Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Social Security regulations establish the following five-step sequential evaluation process to determine whether an individual is disabled:

> (1) whether the claimant is engaged in "substantial gainful activity";
> (2) whether the claimant has a "severe medically determinable physical or mental impairment";

    (3) whether the severity of the impairment meets or equals those impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;
    (4) whether, given the claimant's RFC, the claimant could perform her past relevant work; and
    (5) whether the claimant can perform other work in the national and local economy.

20 C.F.R. § 404.1520(a)(4)(i-iv) (listing five-step analysis for DIB); *id.* § 416.920(a)(4)(i-v) (listing five-step analysis for SSI); *see Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). The steps are considered in order, and if the ALJ can conclusively determine that the claimant is disabled at any given step, the ALJ need not progress to the next step. *See Young v. Barnhart*, 362 F.3d 995, 100 (7th Cir. 2004)*;* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

    An individual who is working is not disabled, regardless of her medical condition. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b). To be found disabled, an individual must have a "severe impairment"—in other words, an impairment that "significantly limits [the claimant's] physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003) (quoting 20 C.F.R. § 404.1520(c)). But a severe impairment alone is not enough. Under step three, the claimant's impairment must meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; if the impairment meets or equals one of those listed, the claimant is presumed disabled and no further inquiry is necessary. *See Rice v. Barnhart*, 384 F.3d 363, 365 (7th Cir. 2004); 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant's impairment does not meet or equal an impairment found on the list, the ALJ must consider the claimant's RFC in assessing steps four and five—whether the claimant's RFC will allow her to perform her past work, and, if not, whether other work exists to accommodate the claimant based on her RFC, age, education, and work experience. *See Rice*, 384 F.3d at 365; 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). While the claimant has the burden of proof in the first four steps in the analysis, if step five is reached, the burden rests with the Commissioner to show that the claimant is capable of performing a significant number of jobs that exist in the national economy. *See* 20 C.F.R. § 404.1560(c).

    **2.**    **The ALJ's Decision**

In this case, ALJ Daniel Dadabo applied the five-step test and determined that Plaintiff was not "disabled," as defined by the Social Security Act, at any time through the date of the ALJ's decision. (R. at 19-20.) In the first step of the analysis, the ALJ concluded that there was no indication that Plaintiff had engaged in gainful activity since the alleged onset of her disability. (R. at 20.) Proceeding to the second step, the ALJ reviewed Plaintiff's medical history, including the record of her March 2001 mastectomy. (R. at 21.) The ALJ further noted that Plaintiff had received mental health treatment well after the surgery for depression related to the surgery, and that Plaintiff was diagnosed with major depression, generalized anxiety disorder, and a personality disorder. (*Id.*) While the ALJ emphasized that the weight of the evidence did not substantiate Plaintiff's testimony about the nature and intensity of her impairment and its resulting limitations, he nevertheless found that Plaintiff had a "severe impairment" as a result of "some physical and emotional residuals from breast cancer and related treatment." (*Id.*) The ALJ further stated that these residuals "may have more than a minimal impact upon" Plaintiff's ability to meet "basic physical and mental demands of work." (*Id.*)

At step three, however, the ALJ found that the medical evidence failed to establish the existence of any impairment or combination of impairments that meets or equals the requisite level of severity listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) The ALJ noted that the Plaintiff's cancer was not metastatic and had not reoccurred since her mastectomy. (*Id.*) To determine the severity of her claimed mental impairment, the ALJ considered the impact of Plaintiff's symptoms on her functioning in four broad areas: "[a]ctivities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation." (R. at 22.)[19] The ALJ recognized that he was required not only to consider objective medical evidence but also the Plaintiff's reported symptoms to the extent that they are consistent with the objective medical

---

[19]      These four criteria are set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1 as criteria for evaluating the severity of a mental disorder.

evidence.  (*Id.*)

Before evaluating Plaintiff's symptoms, however, the ALJ emphasized that a credibility determination was particularly important in this case: Plaintiff had only "infrequent contact with treating mental health sources," did not initiate treatment until a year after the incident (breast cancer) to which she attributes her mental health issues, and lacked a lengthy treatment history that would provide more objective information on her precise diagnosis and symptoms.  (*Id.*)  Thus, the ALJ reasoned, Plaintiff's treating sources based their conclusions primarily on subjective information provided by the Plaintiff.  (*Id.*)  The ALJ proceeded to find that Plaintiff's subjective information on her symptoms, response to treatment, and the impact of her symptoms on her ability to function were not credible.  (*Id.*)  In reaching this conclusion, the ALJ noted what he viewed as inconsistencies in the subjective information that Plaintiff provided to health care professionals, including information Plaintiff provided about her alcohol intake, the amount of daily living assistance her family provided to her, and the circumstances of her being fired from her job as a postal clerk.  (R. at 22-23.)

Considering the record as a whole and giving little credence to Plaintiff's subjective statements, the ALJ concluded that Plaintiff's mental impairment did not impact her daily activities. The ALJ noted that Plaintiff had attributed all of her limitations in this area to her physical condition, rather than her depression.  (R. at 23.)  The ALJ further noted that, despite Plaintiff's testimony that she had been depressed since the death of her sister in 1992, she sustained full-time employment until September of 2000 and lived independently after separating from her husband six months after her March 2001 mastectomy.  (*Id.*)[20]  The ALJ also noted that Plaintiff readily admitted that she takes pride in her personal appearance, does her nails, and gets her hair done on a weekly basis.

_____

[20]     The ALJ stated that Plaintiff had "lived independently at least since separating from her husband," (R. at 23), though it appears as of the date of her interview with Dr. Levitan, that Plaintiff's son, who was seventeen at the time, was living with her.  (R. at 182.)

(*Id.*)

With respect to "social functioning," the ALJ concluded that, despite Plaintiff's mental condition, she has the ability and desire to continue casual interaction with others. (*Id.*) The ALJ pointed to Plaintiff's testimony that "she gets along well with family members, drives or takes public transportation . . ., attends family picnics and reunions, goes to the salon where her sister is employed to have her hair done on a weekly basis, and enjoys board games and cards." (*Id.*) The ALJ further reasoned that Plaintiff spends substantially more time at home for reasons unrelated to her mental condition, noting that she "undoubtedly lacks the finances" to engage in her former hobbies. (*Id.*)

Though the ALJ was convinced that Plaintiff was indeed preoccupied by fear of a possible reoccurrence of cancer, he did not find that this preoccupation would affect Plaintiff's concentration so as to preclude her from completing tasks in an appropriate job. (R. at 24.) The ALJ reached this conclusion based on Plaintiff's "ability to live independently, manage her own finances," cook and drive occasionally, and her enjoyment of reading. (*Id.*) Finally, the ALJ noted that Plaintiff had not experienced any episodes of decompensation as a result of her mental condition. (*Id.*) Despite conceding that Plaintiff may have a "severe impairment," the ALJ thus concluded that her impairment fell short of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*)

Turning to steps four and five of the five-step analysis, the ALJ determined that, based on the objective medical evidence and Plaintiff's subjective statements about the nature and intensity of her symptoms, Plaintiff retains the RFC to fulfill the exertional demands of light work, as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b). (R. at 25.) The ALJ found that the record as a whole did not substantiate Plaintiff's statements about the nature or intensity of her alleged symptoms—her physical pain, adverse side effects of medication, and depression. (*Id.*) In reaching this conclusion, the ALJ pointed to the opinion that Dr. Warren, Plaintiff's treating oncologist, expressed in the

aftermath of a postoperative exam of Plaintiff on April 11, 2001. (*Id.*) Dr. Warren had no knowledge of impairments other than Plaintiff's history of breast cancer; he characterized Plaintiff's ability to do work-related activities as "normal," and he observed that Plaintiff told him that she felt well. (*Id.*) The ALJ acknowledged that Dr. Warren noted that Plaintiff had "some discomfort" in her upper left arm, but, in the ALJ's view, Plaintiff's failure to provide evidence documenting any physical health care since her April 11, 2001 appointment with Dr. Warren indicates that she is not in the disabling pain she claims. (*Id.*) The ALJ further noted that Dr. Warren noted no profound restrictions on Plaintiff's ability to hold objects with her left hand or move her left arm. (R. at 26.) In assessing the credibility of the limitations Plaintiff reported during Dr. Levitan's exam on November 15, 2001, the ALJ noted that Plaintiff identified complaints she had not mentioned previously; he found it significant that Plaintiff had not complained to a treating physician about her pain and the side effects of her medicines. (*Id.*)

The ALJ concluded that Plaintiff could perform light work, which would not include work that requires lifting or carrying objects weighing more than ten pounds frequently or twenty pounds occasionally, in a "low-stress work environment"; in other words, an environment that "entails minimal interaction with co-workers and the public." (R. at 27, 30.) Because Plaintiff's RFC only allowed her to perform "light work," the ALJ found that Plaintiff would not be able to perform her past relevant work as a postal clerk. (R. at 28.)

The ALJ then reached the fifth step and, because Plaintiff's impairment results in both strength and nonexertional limitations, used the Medical Vocational Guidelines as a framework for determining how much Plaintiff's nonexertional limitation diminishes her work capability. (*Id.*)[21] In

---

[21] The Medical Vocational Guidelines classify a claimant as disabled or not disabled based on the claimant's physical capacity, age, education, and work experience. *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). The Guidelines appear as a grid in 20 C.F.R. Part 404, Subpart P, Appendix 2. The rules only consider exertional limitations in determining an occupational base.

(continued...)

light of Plaintiff's "younger" age, status as a high school graduate, and work history as a postal clerk, the ALJ concluded that Plaintiff would be able to perform a significant number of jobs existing in the regional economy. (R. at 29.) The ALJ based this finding on the testimony of the VE who testified that an individual of Plaintiff's age, experience, and education who required light work in a low-stress work environment could work as, for example, an assembler, hand packager, or inspector. (R. at 28.)[22] The ALJ noted that the opinions of Dr. Levitan, who concluded that somatic overlay would compromise Plaintiff's ability to tolerate work pressures, and Dr. Santos who, in her RFC assessment, concluded that Plaintiff's mental status was likely to decompensate under the stress of competitive work, were based on brief interactions with Plaintiff, "who is not a reliable source of information." (*Id.*) The ALJ also considered the assessment of state agency reviewers in reaching this conclusion, but noted that the state agency reviewers assessed Plaintiff with no regard for her credibility. (*Id.*) Accordingly, the ALJ did not find Plaintiff disabled within the meaning of the Social Security Act.

---

[21](...continued)
*See* SSR 83-10, 1983 WL 31251, *3. Thus, where an individual has an impairment or combination of impairments resulting in nonexertional limitations, as Plaintiff claims here, the rules are first considered to see if a finding of disabled can be based on strength limitations alone and, if not, the rules provide a framework for considering how much an individual's work capability is further diminished by the nonexertional limitation. *See* 20 C.F.R. Pt. 404, Sbpt. P, App. 2 § 200.00(e)(2).

[22]     For purposes of the Vocational Guidelines, "light work" includes those jobs that require lifting no more than twenty pounds at a time with frequent lifting, carrying objects weighing up to ten pounds, jobs with "a good deal" of standing or walking, or those that involve sitting most of the time with some pushing and pulling. *See* SSR 83-10, 1983 WL 31251, at *5-6.

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act.  *See* 42 U.S.C. § 405(g).  In reviewing the Commissioner's final decision, the court does not engage in its own analysis of whether the Plaintiff is disabled within the meaning of the Social Security Act.  *Young*, 362 F.3d at 1001 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)).  Nor will the court "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner."  *Id.* (citation omitted).  Rather, the court's role is to determine "whether the ALJ's factual findings are supported by substantial evidence."  *Id.* (citing 42 U.S.C. § 405(g)).  Evidence is substantial if a reasonable person "might accept [it] as adequate to support a conclusion."  *Scheck*, 357 F.3d at 699.

Despite the great deference that this court affords the ALJ's determination, the court "must do more than merely rubber stamp the ALJ's decision."  *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  The court must critically review the ALJ's decision to ensure that the ALJ has articulated some legitimate reason for his decision and built an "accurate and logical bridge from the evidence to his conclusion."  *Young*, 362 F.3d at 1002.  If the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," the court must remand the case.  *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

### B.    Analysis

Plaintiff argues that the ALJ made a number of errors that require reversal of the ALJ's decision.  First, Plaintiff contends that, when determining the Plaintiff's RFC, the ALJ improperly rejected the opinion of mental health professionals in favor of the opinion of Plaintiff's oncologist, and that the ALJ substituted his opinion for that of the psychiatrists in concluding that Drs. Levitan and Santos relied on Plaintiff's history in assessing her mental health.  (Pl. Mot. at 7-10).  Plaintiff

also argues that the ALJ improperly dismissed Dr. Levitan's conclusion that Plaintiff had a somatization disorder and Dr. Santos' conclusion that Plaintiff tended to become preoccupied with her physical complaints when stressed. (*Id.* at 10-11.) Plaintiff further contends that the ALJ should have given Dr. Santos' opinion controlling weight as Plaintiff's treating psychiatrist. (*Id.* at 11-13.) Plaintiff also argues that the ALJ's determination that Plaintiff lacked credibility was in error. (*Id.* at 13-14.). Finally, Plaintiff claims that the ALJ ignored the VE's testimony on the availability of unskilled jobs for individuals who have trouble staying on task. (*Id.* at 14-15.) In her motion for summary judgment, the Commissioner argues that the ALJ's decision was supported by substantial evidence, that the ALJ's assessment of Plaintiff's RFC and of Plaintiff's credibility were reasonable, (Comm. Mot. at 7-13), and that substantial vocational evidence supports the ALJ's finding that Plaintiff could perform a significant number of other jobs. (*Id.* at 13-15.) The court addresses each of these arguments in turn.

### 1. ALJ's Determination of Plaintiff's RFC

The ALJ is tasked with determining the ultimate question of whether Plaintiff meets the statutory definition of "disabled." 20 C.F.R. § 404.1527(e). The Commissioner correctly argues that in making this determination, the ALJ must weigh a physician's opinion along with the record as a whole. *See id.* The ALJ is not, however, entitled to play doctor and make his own independent medical findings. *Rohan v. Charter*, 98 F.3d 966, 970 (7th Cir. 1996). Nor can the ALJ substitute his judgment for that of a medical professional unless the medical professional's opinion is refuted by other medical evidence or authority in the record. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)*; Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995).

Plaintiff first argues that, because Dr. Warren is not a mental health specialist and there is no indication that he was looking for signs of depression, it was improper for the ALJ to disregard the conclusions of both Dr. Levitan and Dr. Santos about Plaintiff's compromised ability to withstand

work pressure or competitive employment in favor of the opinion of Dr. Warren. (Pl. Mot. at 7-8.) In her motion, the Commissioner argues, correctly, as noted above, that the ALJ had an obligation to examine the opinions of Drs. Levitan and Santos in light of all the record evidence, and contends that the ALJ relied properly on Dr. Warren's treatment notes that he considered Plaintiff's overall well-being. (Comm. Mot. at 8-9.)

In the ALJ's view, Dr. Warren's opinion represented an accurate assessment of Plaintiff's symptoms and their impact on Plaintiff's RFC since her mastectomy. (R. at 25.) Specifically, in his June 14, 2001 assessment, Dr. Warren stated that he was not aware that Plaintiff had any other impairments or conditions aside from her breast cancer and her subsequent mastectomy, and that her ability to perform work-related activities such as moving about, lifting, handling objects, and speaking was "normal, as far as [he was] aware." (R. at 178.) In reaching his conclusion about Plaintiff's RFC, the ALJ referred to the opinions of Dr. Levitan, Dr. Santos, and the state agency psychologist, Dr. MacClean, but concluded that Dr. Warren's opinion deserved "greater weight" because of its consistency with the record as a whole. (R. at 27.) In giving the opinions of Dr. Levitan and Dr. Santos less weight, the ALJ also noted that Plaintiff had been treated infrequently by these mental health professionals and they relied on Plaintiff's self-reported history, which the ALJ did not find credible. (R. at 27-28.)

For several reasons, the court is not satisfied that the ALJ has articulated the necessary "logical bridge" from the record evidence to his conclusion that Dr. Warren's opinion should be afforded "greater weight" than those of the mental health professionals in determining how Plaintiff's mental impairment would affect her RFC. *Young*, 362 F.3d at 1002. First, the facts that the ALJ emphasizes to show the consistency of Dr. Warren's opinion with the record relate only to Plaintiff's claimed physical impairment, not to her mental impairment. (R. at 26-28.) For example, to show consistency, the ALJ noted the fact that Plaintiff provided no evidence documenting any physical

health care since her April 11, 2001 appointment with Dr. Warren, and the fact that Dr. Warren did not refer to Plaintiff's claimed limitations on the use of her left hand and arm in his records. (R. at 26.) These facts do bolster the consistency of Dr. Warren's testimony with the record as a whole as it relates to Plaintiff's physical impairment, but they do not reveal any consistency between the record as a whole and any opinion of Dr. Warren on Plaintiff's mental impairment.

The opinion of a treating physician may be afforded "controlling weight" if it is well-supported by medical evidence and is not inconsistent with other evidence in the record. The weight given to medical opinions is otherwise determined by a number of factors, including: whether the source has examined the claimant, the length of treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the supportability of the physician's opinion, its consistency with the record, and the source's specialization. *See* 20 C.F.R. § 404.1527(d); *see also Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) (holding that where a treating physician's opinion is inconsistent with other evidence in the record, the weight to be afforded to that opinion "depends on circumstances.") Here, the ALJ generally refers to Dr. Warren as Plaintiff's "treating physician," but there is no indication in the record that Dr. Warren should be considered as Plaintiff's "treating physician" for any purpose other than oncology. The Social Security regulations confirm the significance of this distinction: "[I]f your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain." *See* 20 C.F.R. § 404.1527(d)(2)(ii); *see also Peabody Coal Co. v. McCandless*, 255 F.3d 465, 469 (7th Cir. 2001) (quoting *Peabody Coal Co. v. Director, OWCP*, 972 F.2d 178, 180 (7th Cir.1992)) ("[I]t is irrational to prefer the opinion of the treating physician, who is often not a specialist, over the opinion of a nontreating specialist *solely* because one physician is the treating physician.")

The ALJ did not establish that Dr. Warren treated or even considered Plaintiff's mental health

when treating Plaintiff. Without such a finding, there can be no basis for giving Dr. Warren's opinion greater weight than those of Drs. Levitan and Santos as they relate to the impact of Plaintiff's mental impairment on her ability to work. There is no indication in the record that Dr. Warren assessed Plaintiff for depression or other mental illnesses, nor that he administered a mental status examination. The Commissioner contends that Dr. Warren's treatment notes reflect his consideration of Plaintiff's overall well-being. (R. at 9.) The Commissioner points to the ALJ's reference to Dr. Warren's notation, as a part of a neoplasm report,[23] that he was not aware of "any other impairments or conditions." (R. at 178.) The Commissioner also points to other statements by Dr. Warren to the effect that Plaintiff "felt well," "was alert," and "was in no apparent distress" on certain occasions when Dr. Warren examined her. (R. at 176-77.) Some of these statements were made before Plaintiff's mastectomy, however; and, in light of Dr. Warren's oncology specialty, these vague statements do not establish that he considered any impairment beyond the physical condition for which he was treating Plaintiff. The ALJ, of course, had the option of contacting Dr. Warren for further explanation or clarification. *See Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (stating that ALJ should have contacted the doctor for clarification); 20 C.F.R. § 404.1512(e)(1) (authorizing ALJ's to seek clarification from medical sources when their report contains an ambiguity or inadequate information).

As the *Wilder* case teaches, the ALJ should not have assumed that Dr. Warren's reports were significant for anything other than information on the condition for which he was treating Plaintiff. 64 F.3d at 336. In *Wilder,* a psychiatrist appointed by the ALJ testified to the date of onset of the plaintiff's depression. *Id.* The ALJ denied the plaintiff's claim for benefits for a number of reasons, including that the plaintiff's medical records "did not mention depression or other mental illness." *Id.* Reversing that determination, the Court of Appeals noted that those medical records

---

[23]     "Neoplasm" is synonymous with "tumor." *See* DORLAND'S at 1107.

related purely to "physical ailments for which [the plaintiff] sought help" and asserted, "there is no reason to expect a doctor asked about an eye problem, or a back pain, or an infection of the urinary tract to diagnose depression." *Id.* at 337. The court proceeded to explain that a doctor who is not a psychiatrist may not be looking for depression or even be competent to diagnose it and concluded that the medical records did not "evince a great deal of common sense about [the plaintiff's] social milieu." *Id.* at 337-38.

In contrast to this case, the psychiatrist in *Wilder* was the only source of medical evidence, but its holding is nevertheless relevant here: *Wilder* establishes that psychiatrists "in particular" are the experts on the mental illness of depression, and that medical records by doctors who are not psychiatrists that do not indicate the presence of mental illness cannot be read to necessarily indicate its absence. *See id.* In fact, the rationale articulated in *Wilder* applies with particular force in this case. Here, two psychiatrists reached similar conclusions regarding Plaintiff's compromised ability to withstand work pressure or competitive employment, and, similar to *Wilder*, the ALJ gave greater weight to the opinion of a non-psychiatrist based on the fact that it did not indicate the presence of a mental impairment. The psychiatrists may have met with Plaintiff less frequently than did Dr. Warren and relied on Plaintiff's own statements. Still, it is not clear that Dr. Warren considered whether Plaintiff was mentally impaired at all.

As noted, the ALJ concluded that the mental health sources had met with Plaintiff infrequently. According to the ALJ, Dr. Santos had only met with Plaintiff three times, and Dr. Levitan only met with her once for forty minutes. (R. at 27.) Plaintiff cites the ALJ's analysis as error; Dr. Santos treated Plaintiff under the auspices of the CDPH, which, according to Plaintiff, gave Dr. Santos access to an extensive record of progress notes from counseling sessions in addition to the psychiatric evaluation and three counseling sessions that Dr. Santos personally conducted. (Pl. Opp'n at 3.) Plaintiff further points out that Dr. Levitan conducted a consultative

evaluation of Plaintiff at the Commissioner's request, and expresses bewilderment that an intentionally one-time evaluation would later be considered meaningless precisely because it only occurred one time. (*Id.* at 5-6.)

It is within the ALJ's power to consider the frequency of treatment in deciding the weight to which he will assign a medical opinion. *See* 20 C.F.R. § 404.1527(d)(2)(i). The ALJ did not address the possibility that Dr. Santos considered a broader range of information than what was garnered from those three treatment sessions, but the court does not believe this by itself was error. First, the record does not reflect that Dr. Santos did indeed review all of the information to which she had access. In any event, the ALJ is not required to evaluate every piece of evidence in writing. *Rice*, 384 F.3d at 371. While the court does not find error in the ALJ's consideration of the frequency of treatment, the court notes that, upon remand, the ALJ may need to reconsider the weight with which the frequency of treatment figures into his conclusions regarding Plaintiff's RFC. It would not be appropriate to afford less weight to the opinions of the mental health professionals on the basis that they provided treatment less frequently than Dr. Warren if, upon remand, the ALJ concludes that Dr. Warren did not consider Plaintiff's mental health at all.

Plaintiff also challenges the ALJ's decision to give less weight to the opinions of Drs. Levitan and Santos on the basis stated by the ALJ that "[c]learly, in formulating their conclusions . . . both physicians relied upon history provided to them by claimant, who is not a reliable source of information." (R. at 27.) The ALJ is allowed to consider the "supportability" of a medical opinion when determining the weight it deserves, *see* C.F.R. § 404.1527 (d)(3), but, as stated above, the ALJ may not substitute his own judgment for that of a medical professional unless it is refuted by other medical evidence or authority in the record. See *Clifford*, 227 F.3d at 870. Especially when diagnosing depression, "health professionals, in particular psychiatrists, not lawyers or judges, are the experts on it." *Wilder*, 64 F.3d at 337. By granting the conclusions of Drs. Levitan and Santos

less weight on the basis of their reliance on Plaintiff's statements, however, the ALJ substituted his judgment for that of these medical professionals.  *See Clifford*, 227 F.3d at 870.  Contrary to the Commissioner's position, (Comm. Mot. at 9-10), the court finds nothing in the record that establishes the extent to which Drs. Levitan or Santos relied on Plaintiff's history in diagnosing Plaintiff, and nothing that supports the conclusion that they "primarily" relied on Plaintiff's history.  (R. at 22) (stating that Plaintiff's treating sources "formulated conclusions . . . primarily upon subjective information provided to them by the claimant.")  The Commissioner cites *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995), for the proposition that a doctor's opinion may be given less weight when based on a claimant's own statements about their impairments.  (Comm. Mot. at 10.)  In *Diaz*, however, the court was aware that the plaintiff had exaggerated the functional restrictions on his "ability to sit, stand, or walk," and specified that the ALJ could consider the portion of the doctor's report related to those limitations as less significant.  *See* 55 F.3d at 307-08.  Here, if Drs. Levitan and Santos did rely on Plaintiff's history to some degree, there is no indication as to what statements by Plaintiff they relied on and whether the portions of Plaintiff's history they relied on were unreliable.  Although it is not evident from the face of Drs. Santos and Levitan's evaluations, even if these doctors did rely to some extent on Plaintiff's self-reported history, it is reasonable to assume that mental health professionals such as Drs. Levitan and Santos would consider the possibility that Plaintiff was malingering or exaggerating in their assessments.

While the record does not include the results of any formal psychological tests that Drs. Levitan and Santos may have performed, both Dr. Levitan and Dr. Santos had the opportunity to observe the Plaintiff in person and to apply their own education and experience in diagnosing Plaintiff and determining how her mental impairment would affect her ability to work.  Dr. Levitan's notes mention in several instances his observations about Plaintiff's demeanor, degree of sadness, and body movement.  (R. at 180-82.)  In his analysis of Plaintiff's "mental status," Dr. Levitan appears to have put Plaintiff through exercises to gauge her insight, judgment, and ability to think

abstractly. (R. at 183.)[24]  Similarly, Dr. Santos observed Plaintiff and, according to her evaluation, assessed Plaintiff's appearance, behavior, insight, speech, affect, mood, memory, judgment, and thought content. (R. at 214.)[25]  The ALJ's determination that the opinions of Drs. Levitan and Santos should be given less weight on the basis of their reliance on Plaintiff's history is therefore not supported by substantial evidence. Whether Dr. Warren assessed Plaintiff's mental impairments in forming his conclusions, and whether Drs. Levitan and Santos relied on unreliable statements made by Plaintiff in formulating their conclusions, could affect the weight given to the various medical source's opinions in determining Plaintiff's RFC. Because the court finds the record insufficient on these issues, the court will remand for further evaluation.

### 2.     ALJ's Dismissal of Plaintiff's Somatization Disorder

The ALJ implicitly rejected that Plaintiff has a somatization disorder by finding that Plaintiff's "mental condition has little impact upon her ability to perform typical activities of daily living," and by otherwise failing to mention Dr. Levitan's diagnosis of Plaintiff's somatization disorder. Somatoform disorders are a well-recognized phenomenon that occurs when a patient has physical symptoms without any known physical cause. MERCK at 1736-40; *see Sims v. Barnhart*, 442 F.3d 536, 537 (7th Cir. 2006) (citations omitted). If a claimant produces medical evidence of an impairment, "the Commissioner cannot discredit the claimant's testimony [about her] subjective symptoms merely

---

[24]     For example, Dr. Levitan reports: "Her ability to think abstractly seemed somewhat off. Her response to the proverb "Glass Houses" was "[t]hat something always happen, or nothing is steady or concrete." (R. at 183.)

[25]     The Commissioner also argues that Dr. Santos' opinions do not support her conclusion that Plaintiff would decompensate under work pressure. (Comm. Mot. at 10.) By interpreting Dr. Santos' treatment notes, the Commissioner is asking the court to make independent medical determinations, which the court declines to do. *See Rohan*, 98 F.3d at 970. The court need not address the Commissioner's further argument that the ALJ did credit Dr. Santos' opinion by accepting her diagnosis of major depression and by including a restriction on Plaintiff's work to low-stress environments. (R. at 10.) That Dr. Santos' opinion may have been given some weight in the first instance does not eliminate the need to assess whether it was given the proper weight.

because they are unsupported by objective evidence." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). Accordingly, Plaintiff is correct in her contention that if she were found to be disabled, she would be entitled to benefits even if the cause of the disability is purely psychological. *See Sims*, 442 F.3d at 537.

In this case, Dr. Levitan diagnosed Plaintiff with "mixed anxiety-depression with possible somatization and emotional overlay of her physical problems." (R. at 184.)[26] While Dr. Santos did not diagnose a somatization disorder, she observed that Plaintiff was "preoccupied with thoughts about her physical health." (R. at 212.) Plaintiff contends that the ALJ improperly dismissed her somatization disorder in two instances: first, when determining that Plaintiff's mental impairment had little impact on her ability to perform daily living activities,[27] and second, in giving weight to Dr. Warren's opinion that Plaintiff had no other health concerns. (Pl. Mot. at 10-11.) The Commissioner argues that neither doctor specifically diagnosed Plaintiff with a somatoform disorder and that the ALJ rejected Plaintiff's testimony on her subjective symptoms as a result of the ALJ's credibility determination, not solely because of the lack of objective evidence. (R. at 11.)

The ALJ considered Plaintiff's activities of daily living as one of four factors in assessing the severity of Plaintiff's mental impairment. In this context, the ALJ stated that Plaintiff's mental condition "has little impact on her ability to perform typical activities of daily living." (R. at 23.) He observed that Plaintiff had been living independently since six months after her March 2001 mastectomy. (*Id.*) The ALJ further noted that, "[c]ontrary to the [Plaintiff's] testimony that she has

---

[26]     Immediately following this diagnosis, Dr. Levitan gave a narrative explanation of his diagnoses and called Plaintiff's somatization "probable" as opposed to "possible." (R. at 184.)

[27]     Plaintiff argues that the mental impairment of a somatization disorder leads Plaintiff to limit her activities, even though, in Plaintiff's mind, she is limiting her activities because of a physical impairment. (Pl. Mot. at 10-11.) Thus, the Plaintiff contends, the ALJ's finding that all limitations on Plaintiff's activities of daily living are attributed to her physical impairment was improper.

lost interest in virtually all activities she formerly enjoyed," Plaintiff "takes pride in her personal appearance, which is consistent with her testimony that she does her nails and gets her hair done at a salon on a weekly basis." (*Id.*)  The ALJ need only establish an "accurate and logical bridge from the evidence to his conclusion." *Young*, 362 F.3d at 1002.  Because the ALJ has provided substantial evidence that Plaintiff's daily activities have not been severely limited on the whole, it is of no importance that whatever limitations were imposed may be the product of a mental rather than a physical impairment.

The court has already addressed Plaintiff's second argument—that the ALJ erred by giving weight to Dr. Warren's opinion that Plaintiff had no other health concerns.  As discussed above, the record is insufficient to establish whether or not Dr. Warren considered Plaintiff's mental health status when he determined that Plaintiff had no other health concerns or impairments aside from her breast cancer and mastectomy.  (*See supra* Section B.1.)  For the reasons explained earlier, this court will remand this issue to the ALJ for further evaluation.

**3.    ALJ's Failure to Give Controlling Weight to Dr. Santos' Opinion as a Treating Physician**

Plaintiff characterizes Dr. Santos as her treating physician and argues that the ALJ erred in failing to give controlling weight to her opinions.  A treating source is a "physician, psychologist, or other acceptable medical source" who provides medical treatment or evaluation and has an "ongoing treatment relationship" with the claimant.  20 C.F.R. §§ 404.1502, 416.902.  An "ongoing treatment relationship" does not require that the claimant sees the medical source with any particular frequency, but the nature and frequency of the treatment must be "consistent with accepted medical practice" for the particular condition being treated.  *See id.*; *see also White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005) (finding, under the regulations, that a doctor who only treated individual once did not have an ongoing treatment relationship with individual).  Because treating physicians

can bring a "detailed, longitudinal" picture of the claimant's impairments that cannot otherwise be obtained, the Social Security regulations provide that, generally, more weight is given to opinions from treating sources. *See* 20 C.F.R. § 404.1527(d)(2). When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it may be given controlling weight. *See White*, 415 F.3d at 658; 20 C.F.R. § 404.1527(d)(2).

As noted earlier, Dr. Santos concluded that Plaintiff "could not tolerate work stress nor maintain sustained attention and concentration sufficient to sustain work." (Pl. Mot. at 11-13.) According to Plaintiff, Dr. Santos' psychiatric evaluation and follow-up sessions with Plaintiff and the additional therapy and evaluation sessions performed at CDPH, the clinic where Dr. Santos practices, are "medically acceptable clinical and laboratory diagnostic techniques" and are not inconsistent with any other evidence in the case record. (Pl Mot. at 11-12.) 20 C.F.R. § 404.1527(d)(2). The Commissioner refers to Dr. Santos as Plaintiff's "treating psychiatrist," but does not directly address the issue of whether Dr. Santos' conclusions should be granted controlling weight. (Comm. Mot. at 7, 9-10.) Instead, the Commissioner notes the ALJ's findings that Dr. Santos had infrequent contact with Plaintiff and, observes that, in any event, the ALJ did credit Dr. Santos' findings to some degree, by including a work stress restriction in Plaintiff's RFC. (Comm. Mot. at 9-10.)

The court is uncertain whether the ALJ considered that Dr. Santos may qualify as a treating psychiatrist. At one point the ALJ referred to Plaintiff's "treating sources" at the clinic where Dr. Santos practices, and the ALJ also referred to her "treating" mental health care professionals in multiple instances. (R. at 23-24.) Still, it is evident from the ALJ's decision to give Dr. Warren's opinion "greater weight" that the ALJ did not give Dr. Santos controlling weight. (R. at 27.) The record, however, is not explicit as to whether the ALJ did not give Dr. Santos' opinion controlling

weight because he did not consider Dr. Santos to be a treating physician, or because he did not find Dr. Santos' conclusions "well-supported by medically acceptable clinical and laboratory diagnostic techniques," or "not inconsistent with the other substantial evidence in [the] case record." *See White*, 415 F.3d at 658; 20 C.F.R. § 404.1527(d)(2). The court will therefore consider both possibilities in turn.

If the ALJ did not grant controlling weight to Dr. Santos' opinion because it found that Dr. Santos and Plaintiff lacked an ongoing treatment relationship, the court concludes that finding lacks the necessary evidentiary support. *See Steele*, 290 F.3d at 940. Plaintiff was first treated at the CDPH in the Division of Mental Health in June 2002. (R. at 206.) She saw Dr. Santos again on July 18, 2002, (R. at 212), August 27, 2002, (R. at 215), and October 1, 2002. (R. at 203.) The hearing occurred before the ALJ on October 2, 2002. Thus, in the three months preceding the hearing, Plaintiff had seen Dr. Santos three times. The record includes no evidentiary support to conclude that the nature and frequency of this treatment was inconsistent "with accepted medical practice" for treating Plaintiff's mental impairments such that Dr. Santos should not be considered a treating physician under the regulations. *See id.*; *see also White*, 415 F.3d at 658.

The second possibility assumes that the ALJ did consider Dr. Santos to be Plaintiff's treating physician, but did not grant Dr. Santos' conclusions controlling weight because they were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques," or were "inconsistent with the other substantial evidence in [the] case record." *See White*, 415 F.3d at 658; 20 C.F.R. § 404.1527(d)(2). The ALJ did not specifically address this matter. He did contrast Dr. Santos' conclusions regarding Plaintiff's RFC with those of Dr. Warren, stating, "[o]n the other hand, the opinion of the treating physician, Dr. Warren, who stated he was aware of no health concerns other than the claimant's history of breast cancer and mastectomy, merits greater weight as it is consistent with the record as a whole." (R. at 27.) This statement is not, however, an explicit

determination that Dr. Santos' conclusions were inconsistent with those of Dr. Warren. First, Dr. Warren met with Plaintiff in June of 2001, while Dr. Santos concluded that Plaintiff's limitations began in August 2001. (R. at 205.) Further, Dr. Warren's statement that he was not *aware* that Plaintiff had other impairments or conditions is not necessarily inconsistent with Dr. Santos' opinion that Plaintiff did have limitations on her ability to tolerate work stress. The ALJ also does not articulate any other substantial record evidence inconsistent with Dr. Santos' opinion that Plaintiff's "mental status would likely result in de-compensation under the stress" of work. (R. at 204.) Because this court finds the record insufficient to establish whether Dr. Santos' opinion should have been given controlling weight, this issue is remanded to the district court for further evaluation.

### 4. ALJ's Credibility Determination

Plaintiff challenges the ALJ's negative assessment of her credibility. Absent objective medical evidence to substantiate an individual's statements about the intensity and persistence of pain or other symptoms, the ALJ must consider the entire case record and make a finding on the claimant's credibility. *See* SSR 96-7p, 1996 WL 374186, *2; *see also Schmidt v. Barnhart*, 395 F.3d 737, 747 (7th Cir. 2005) (stating that ALJ's assessment of plaintiff's credibility was proper in the absence of objective medical evidence). A determination that an individual's statements are not credible must contain "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific [as to] the weight the [ALJ] gave to the individual's statements and the reasons for that weight." *See* SSR 96-7p, 1996 WL 374186, at *2. Because the ALJ is in the best position to assess a witnesses' credibility, however, this court will not disturb an ALJ's credibility determination as long as there exists some support in the record. *See Dixon v. Massanari*, 270 F.3d 1171, 1178-79 (7th Cir. 2001). In other words, the ALJ's credibility finding is entitled to deference unless it is "patently wrong." *See Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (internal quotations and citation omitted).

In addressing the credibility of Plaintiff's complaints in this case, the ALJ noted her "infrequent contact with treating mental health sources," the fact that Plaintiff did not initiate treatment until a year after the incident (breast cancer) to which she attributes her mental health issues, and the absence of any lengthy treatment history that would provide more objective information on her precise diagnosis and symptoms. (R. at 22.)  The ALJ found Plaintiff to be an unreliable historian and therefore considered as unreliable the subjective information that Plaintiff provided to the mental health care professionals on "her depressive symptoms, her response to treatment, and the impact of her symptoms on her ability to function." (*Id.*)  In his analysis, the ALJ pointed to several statements he deemed inconsistent regarding Plaintiff's alcohol intake, the assistance she receives from her family, and the reason(s) she did not return to her job as a postal clerk. (R. at 22-23.)

Plaintiff contends that no credibility determination was appropriate in this case because the opinions of Drs. Santos and Levitan were supported by objective psychological evidence. (Pl. Opp'n at 6-7.)  To the extent credibility was addressed at all, Plaintiff urges, the ALJ should have considered the affidavit of Plaintiff's sister, Phyllis Jarvis, which bolstered her testimony.  In any event, she contends that the record evidence as a whole supported her credibility, and that any inconsistent statements regarding her alcohol use do not support a finding that she is not credible because alcohol use was not a factor in her disability. (Pl. Mot. at 13-14.)  In her motion for summary judgment, the Commissioner responds that the ALJ acted properly in not discussing Jarvis' affidavit as the record as a whole did not support Jarvis' affidavit, and that the ALJ's credibility findings were supported by substantial evidence in the form of examples where Plaintiff provided inconsistent information. (Comm. Mot. at 11-12.)

While Plaintiff is correct that psychological tests and evaluations can constitute objective evidence of her mental impairment, 20 C.F.R. § 404.1528, the court does not agree with Plaintiff's

argument, raised for the first time in her reply brief, that Drs. Santos and Levitan's opinions rendered any credibility determination unnecessary.  (Pl. Opp'n at 6-7.)  Plaintiff not only claims to have a mental impairment but also claims to have physical limitations, which are not supported by objective medical evidence.  Dr. Warren concluded that Plaintiff's ability to do "work-related activities" was normal, as far as [he was] aware," while Plaintiff complains of "throbbing" pain in her shoulders and limited use of her left arm and hand.  (R. at 47-48.)  Dr. Levitan did opine that Plaintiff had "probable" or "possible" somatization—a mental disorder that would explain the lack of objective medical evidence regarding Plaintiff's claimed physical impairment—but the language of his diagnosis is somewhat provisional.  (R. at 184.)  Further, Dr. Santos, who did note that Plaintiff was preoccupied with thoughts about her physical health, nevertheless did not suggest that Plaintiff suffers from a somatization disorder that would explain the lack of objective medical evidence of Plaintiff's physical impairments.  (R. at 212.)  Additionally, the intensity of some of Plaintiff's claimed symptoms and side effects, for example, her forgetfulness or her inability to concentrate, are not clear from the objective medical evidence.  (R. at 46, 63.)  Similarly, Plaintiff claims she cannot concentrate enough to drive, while Dr. Santos and Dr. MacClean characterized her limitation in concentration as moderate and mild, respectively.  (R. at 195, 204.)  The court therefore finds that it was proper for the ALJ to make a credibility finding, based on the record as a whole, to assess the intensity and frequency of Plaintiff's claimed symptoms.  *See* SSR 96-7p, 1996 WL 374186, at *2.

In making a credibility assessment, the ALJ is entitled to consider the consistency of statements made by the claimant.  This includes statements from the claimaint (or others, including physicians) about "the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individuals' symptoms and how the symptoms affect the individuals' ability to work."  *See* SSR 96-7p, 1996 WL 374186, at *5.  The ALJ cannot cite general "inconsistencies," but must specifically state particular inconsistencies.  *See Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).  The ALJ properly did so in this case,

comparing Plaintiff's testimony with statements she made to various people, and with her daily activities.

The ALJ noted that in a conference with a therapist on July 18, 2002, Plaintiff denied receiving any family support, but at the hearing she testified that she receives substantial assistance with her daily living activities from her sister. (R. at 22-23.) The ALJ also noted Plaintiff's conflicting information about why she was terminated from her job as a postal clerk: Plaintiff testified that she was terminated in September 2000 because she failed to advise her employer that her return to work would be delayed due to her discovery that she had breast cancer, a statement inconsistent with the date on which Plaintiff's cancer was actually diagnosed. (R. at 23.) As the ALJ pointed out, Plaintiff testified that she spends a significant amount of time going to and from doctor's appointments, but the record only supports that she had a small number of appointments. (R. at 25.) And, although Plaintiff complained to Dr. Levitan of residual physical pain and adverse side effects from her medication, there is no evidence that she sought treatment for the pain or adjustment of her medication, (R. at 26.) *See* SSR 96-7p, 1996 WL 374186, at *7 (stating that an individual's statements may be considered less credible if the frequency of treatment does not match the level of the complaints). The court is not permitted to reweigh this evidence. *White*, 415 F.3d at 659. Not all of the ALJ's criticisms of Plaintiff's credibility are compelling. Only some but not all of the statements she made at various times regarding her alcohol intake are inconsistent. Further, the fact that Plaintiff continued working until 2000 is not inconsistent with her assertion that she has suffered from depression since her sister's death in 1992; Plaintiff stated clearly that her depression worsened upon her diagnosis with cancer. (R. at 212.) Still, the numerous specific examples cited by the ALJ do support his adverse credibility assessment. *See Dixon*, 270 F.3d at 1178-79.

Nor did the ALJ act improperly in failing to mention specifically the affidavit of Plaintiff's sister, Phyllis Jarvis. While the ALJ may not decline to consider an entire line of evidence, *Carlson v.*

*Shalala*, 999 F.2d 180, 181 (7th Cir. 1993), he is not obliged to "provide a written evaluation of every piece of evidence." *Rice*, 384 F.3d at 363 (citation omitted). Where additional evidence essentially corroborates evidence in the record, the ALJ need only "sufficiently articulate his assessment of the evidence" to trace his reasoning and provide assurance that he "considered the important evidence." *See Carlson*, 999 F.2d at 181 (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)). Plaintiff's sister's affidavit corroborates Plaintiff's own testimony that her appearance, behavior, and mood have changed since her cancer diagnosis; that she goes out less often than before; and that her behavior post-diagnosis impedes her interactions with others. (R. at 157-58.) The ALJ acknowledged those facts: he noted that Plaintiff alleges disabling depression, that she spends substantially more time at home, and that she "may be preoccupied with the fear of a recurrence of cancer." (R. at 23-25.) As the ALJ did consider this line of evidence pertaining to changes in Plaintiff before and after her diagnosis of cancer, his failure to explicitly discuss Jarvis' affidavit does not constitute error.

### 5. ALJ's Consideration of VE's Testimony

The VE testified that an unskilled worker must have the ability to maintain attention for at least two-hour segments. He further agreed that anything that takes an employee of Plaintiff's vocational profile off task, such as a concentration lapse, would limit her ability to carry on competitive employment. (R. at 78-79.) The VE also testified that "usually, if they're off task more than 5 percent of the time, and certainly more than 10 percent of the time, that is a significant reduction" in such an individual's ability to carry on competitive employment. (R. at 79.) Plaintiff contends that the ALJ erred in failing to relate his finding that Plaintiff has mild interference with her concentration and attention to the VE's testimony regarding the necessary attention span for the hypothetical individual to whom the VE testified there would be significant jobs available. (Pl. Mot. at 14.) The Commissioner insists that the ALJ did account for the limitation in Plaintiff's concentration by deciding, at the time he determined Plaintiff's RFC, not to include a work restriction

related to a limitation on Plaintiff's ability to concentrate. While the court agrees with the Commissioner that the ALJ did consider whether Plaintiff was limited in her ability to concentrate, the court finds the record insufficient to determine whether the ALJ's conclusion—that Plaintiff would not be limited in her job opportunities as a result of a limitation in her ability to concentrate—is supported by substantial evidence.

"[A] hypothetical question to the vocational expert must include all limitations supported by medical evidence in the record" so that the VE can understand the full extent of the claimant's disability. *Young*, 362 F.3d at 1003. Here, the ALJ did indeed question the VE on how a concentration limitation would affect the number of jobs available to the relevant hypothetical individual. (R. at 78-79.) And, in evaluating the record evidence, the ALJ concluded that Plaintiff's concentration was limited "mildly." (R. at 24.) The ALJ explained:

> [Plaintiff's] ability to live independently, to manage her own finances and do occasional cooking . . . to drive when she chooses to do so, and her enjoyment of reading leads to a reasonable conclusion that the claimant's ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in the workplace is consistent with that required of jobs suitable for an individual with her level of academic achievement and vocational experience.

(R. at 24.) In concluding that Plaintiff had a "mild" limitation on her ability to concentrate and opting not to include a concentration limitation as a part of Plaintiff's RFC, the ALJ did not explicitly consider any of the medical opinions addressing Plaintiff's concentration abilities. (*Id.*) Among the evidence the ALJ did not address is Dr. Levitan's observation that Plaintiff had difficulty concentrating during their visit, (R. at 183), Dr. MacClean's determination that Plaintiff has "mild" difficulties in maintaining concentration, (R. at 195), and Dr. Santos' conclusion that Plaintiff has a moderate ability to maintain sustained concentration and that she would be "unable to concentrate and . . . to sustain attention" in a "competitive full-time job in a non-sheltered environment." (R. at 204.)

While it is not the task of this court to weigh this evidence, this court must ensure that the ALJ has articulated "some legitimate reason for his decision and built an "accurate and logical bridge

from the evidence to his conclusion." *Young*, 362 F.3d at 1001-02. By failing to discuss the medical opinions regarding Plaintiff's ability to concentrate at all and failing to explain why the "mild" limitation that existed in the ALJ's estimation would not result in the Plaintiff being off-task more than five or ten percent of the time such that she would be unable to perform competitive work, the court cannot adequately review the ALJ's final determination that a significant number of jobs are available to Plaintiff. *See Steele*, 290 F.3d at 940. The court therefore remands the issue of whether Plaintiff's concentration limitations may limit her ability to perform competitive work to the ALJ for further evaluation. The court notes that it may very well be the case that a "mild" or "moderate" limitation in concentration would not result in Plaintiff being off task for an amount of time that would limit her ability to perform competitive work; the record as it currently stands, however, is insufficient to reach this conclusion.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment (12) is granted, the Commissioner's motion for summary judgment (13) is denied, and the case is remanded to the ALJ for further proceedings consistent with this opinion, pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the ALJ should consider whether the proper weight was given to the medical testimony, more specifically, whether Dr. Warren assessed Plaintiff's mental impairments in forming his conclusions, whether Drs. Levitan and Santos relied on unreliable statements made by Plaintiff in formulating their conclusions, and whether Dr. Santos' opinion is entitled to controlling weight. The ALJ should also further evaluate whether Plaintiff's concentration limitation may limit her ability to perform competitive work in light of the VE's testimony. If it becomes necessary in light of this further evaluation, the ALJ should reassess Plaintiff's disability status.

ENTER:

40

Dated: December 22, 2006

_____
REBECCA R. PALLMEYER
United States District Judge